IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SANDRA L. ALBRECHT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | CIV. A. NO. _____ |
| | § | |
| | § | |
| HOTEL RESERVATION | § | |
| SERVICE, INC. | § | |
| | § | JURY DEMANDED |
| *Defendant.* | § | |
| | § | |

**ORIGINAL COMPLAINT AND JURY DEMAND**

Sandra L. Albrecht complains of Hotel Reservation Service, Inc.'s violations of federal and state law forbidding discrimination in employment. HRS's decisions, acts, and omissions regarding Albrecht violate the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), as amended, Tex. Labor Code § 21.001 *et seq.*

## I.  INTRODUCTION

1. Hotel Reservation Service, Inc. (HRS) holds itself out as a forward-looking company that aims to disrupt the travel industry. Regrettably, HRS's identity rests on a foundation of ugly age bias and impermissible ageist stereotypes. When its North American sales director refused to rid the company of "old, fat, lazy people" on his team, HRS brought in a new director

willing to act on both this explicit age bias and on time-worn stereotypes that older employees are unable or unwilling to learn new skills. A long-time, well-liked, and productive employee in her mid-50s, Sandra L. Albrecht, was in the way. HRS terminated her – suddenly and without prior performance counseling – on or about January 17, 2020. Disregarding its duties under the law, HRS would not have terminated Albrecht when it did but for her age and/or impermissible age biases and stereotypes. Albrecht now brings this suit to end HRS's discriminatory practices, to protect others from HRS's flagrant age bias, and to be made whole for the significant and lasting harm done.

## II.    PARTIES

2.    Sandra L. Albrecht is a 56-year-old citizen of Texas residing in Coppell, Dallas County, Texas.

3.    Hotel Reservation Service, Inc. ("HRS") is a foreign corporation with its headquarters at 1156 Avenue of the Americas, Ste. 305, New York, NY 10036. HRS conducted business in Texas – including by employment Albrecht and others in Texas – at all times material to these claims and continues to do substantial business in Texas. The causes of actions asserted below arose from and are connected to purposeful acts by HRS and its agents during and after Albrecht's employment. HRS may be served with process on its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

4.    When Albrecht alleges that HRS acted or failed to act, she means that its officers, directors, principals, vice-principals, agents, servants, and/or

employees committed the act or omission within the course and scope of that individual's agency or employment with HRS and with HRS's full authorization, ratification, or approval.

### III.   JURISDICTION AND VENUE

5. This court has original jurisdiction to hear the merits of these ADEA claims under 28 U.S.C. §§ 1331 and 1343 and 29 U.S.C. § 626. The court has supplemental jurisdiction over the TCHRA claims under 28 U.S.C. § 1367.

6. HRS does substantial business in this district and division and is subject to personal jurisdiction here. A substantial portion of the acts and omissions leading to Albrecht's claims – including the unlawful termination – occurred at the Dallas Office, 770a Las Colinas Blvd., Suite 440, Irving, Texas 75063. Venue is therefore proper in this district and division under 28 U.S.C. § 1391.

### IV.   FACTUAL BACKGROUND

7. Hotel Reservation Service Robert Ragge GmbH ("HRS Group") markets itself as a worldwide provider of business hotel procurement services for corporate travel managers and companies around the world. Based in Cologne, Germany, HRS Group employs around 1500 people in over two dozen offices worldwide, including three offices in the United States. HRS is the HRS Group's U.S. subsidiary. As of the end of 2019, HRS had three offices in the United States (Dallas, New York, and San Francisco) and employed over 40 employees in this country. HRS Group's Chief Executive Officer is Tobias

Ragge, son of the company's founder. Ragge is also HRS's President and a member of its Board of Directors.

8.  From about 2015 to about January 2020, Suzanne Neufang was HRS Group's Senior Vice President – Enterprise Solutions and its Managing Director – North America. Neufang recruited and hired Albrecht – as one of her earliest hires – in or about April 2015 as the Head of Strategic Partnerships – North America. Albrecht had over a decade of experience in the corporate travel and technology industry when hired. That experience included strategy, development, and implementation of business-to-business (B2B) partnerships and client retention programs.

9.  HRS was at all relevant times an "employer" under the ADEA and the TCHRA.

10.  HRS professes to be an equal-employment opportunity employer and to value its employees. But in practice the company places almost no emphasis on worker protections like anti-discrimination laws and equal-employment-opportunity policies. Training on non-discrimination and non-retaliation practices and protections is minimal, and this lack of emphasis filters down to employment decisions.

11.  HRS thought highly of Albrecht's performance for nearly five years, until her unlawful termination in or about January 2020. Until then, feedback from supervisors and company leadership was overall quite positive. Her manager, Eric Hofer (Director, Enterprise Solutions – North America),

found her to be a "dedicated, hard-working, and positive contributor to the Sales team." The company showed its confidence by asking Albrecht in or about August 2018 to become the Head of Business Development, reporting to Hofer.

12. HRS never issued Albrecht written performance counseling or any Performance Improvement Plan in nearly five years of employment. In or about 2019, Albrecht brought the likes of Accenture and Oracle to the table, retained Halliburton when they were walking out the door, obtained a verbal agreement from The Weirs Group, developed an active pipeline, and closed business with Koenig & Bauer and ATOS USA. HRS gave no counseling or warning about performance concerns or deficiencies. In fact, as late as or about December 12, 2019, Neufang (also in her 50s) complimented Albrecht and raved about her performance at a prospect meeting.

13. In or about May 2019, Hofer left HRS over disagreements about HRS's discriminatory practices. His departure followed meetings with CEO Ragge in or about April 7-9 at the ACTE conference in Chicago, Illinois. In a meeting on or about April 8, 2019, on the periphery of the conference space, Ragge indicated that he expected Hofer to "get rid of these old, fat, lazy people," referring to a group of HRS employees standing nearby. Albrecht, Ed Li, and another six to eight people (most, if not all, in their 40s or older) comprised the targeted group.

14. Notably, the "old, fat, lazy people" directive from Ragge was not the first time that Ragge made insensitive, age-biased, mean spirited, or

otherwise improper comments to or around Hofer and other HRS leadership. On more than one occasion during leadership or strategy discussions, Ragge assessed that a current employee did not "fit the mold," saying instead that HRS needed "young, aggressive" types. Ragge directed Hofer and others not to hire "travel industry people" but instead to go after "young, hungry tech people" going forward. Others in HRS Group and HRS leadership received directives to "hire young" (specifically, young women).

15. In or about June 2019, the company reassigned Albrecht as an individual contributor Business Development Manager (BDM). In this role, Albrecht solicited and interfaced directly with some of the company's largest and most consequential potential new customers (including Accenture, Oracle, The Weir Group, Halliburton, ATOS, Koenig, and Bauer, among many others). As of about January 2020, Albrecht had more than $1 billion in hotel turnover – which is how HRS rates prospects – in her pipeline and closed substantial business and brought high-profile prospects to the table in 2019.

16. In or about mid-June 2019, Neufang spoke with Albrecht about moving into the BDM role. Neufang explained that the company was searching for Hofer's replacement and that CEO Ragge did not want a management layer between the Director of Sales and the BDMs. Neufang added that Albrecht's skills were needed to close sales rather than manage a team, which would be the focus of the new Director of Sales. She highlighted the role's significant financial upside via the greater bonus potential as an individual BDM.

17. On or about June 12, 2019, Neufang followed the in-person discussion with a letter confirming the reassignment. Neufang thanked Albrecht for her "contribution as Head of BDMs these past few months." She then said that due "to HRS CEO directives [HRS was] making an organization structure change, effective June 24, 2019." Neufang's letter then set out Albrecht's pay and bonus opportunity in the BDM role. Over the next six months as an individual contributor, Albrecht developed a robust pipeline, closed substantial business, and brought high-profile prospects to the table.

18. HRS hired Vincent Spadafora (then-early 40s) in or about July 2019 to replace Hofer as the Director of Sales. Over the next few months, Spadafora fired one BDM and drove out another (who was in his 50s). That left Albrecht as the only BDM in the Dallas office by the end of 2019, at a time when HRS was in explicit and much-publicized growth mode.

19. Between or about August 3-7, 2019, Albrecht and others from HRS Group attended the Global Travel Association meeting in Chicago, Illinois. CEO Ragge also attended and, on information and belief, discussed strategy and personnel with the new Director of Sales, Spadafora.

20. In or about November 2019, Spadafora met with Albrecht for their first one-on-one meeting. Spadafora was satisfied with Albrecht's overall performance and gave no indication of concern. On the contrary, Spadafora asked Albrecht to consider a move into Account Management. Spadafora said he thought the Head of Account Management might leave and that Albrecht

would be perfect for that role because she could train Account Managers how to cross-sell and upsell, which he said was needed. Albrecht said that she would think about it.

21.    In or about early December 2019, Albrecht and others in the Dallas office learned that CEO Ragge would be at the Dallas office for the Sales Kickoff meeting to be held on or about January 30-31, 2020.

22.    In or about January 2020, HRS hired two new BDMs in the DFW office, including a male in his 30s with little or no travel-industry experience (Chris Peterman). Peterman lasted less than six months in the position, while the other new BDM left HRS in or about July 2020.

23.    In or about the week of January 10, 2020, Spadafora held a one-on-one meeting with Albrecht so that she could prepare Spadafora for his presentation at the upcoming Sales Kickoff. Spadafora asked to review the top 10 North America prospects (five of which were in Albrecht's pipeline).

24.    HRS terminated Albrecht on or about Friday, January 17, 2020. Around 3:00pm, Albrecht met Spadafora in a conference room under the pretense of meeting to discuss a business case on Albrecht's prospect (Accenture). Spadafora began talking about the pressures of the new year and expectations on "[him] and [his] team." He claimed that the North America region was reorganizing – that the US region that had been reporting to the "CTO or COO" – would now report directly to CEO Ragge. Spadafora said that

this would "put a lot more pressure on [him] and [his] team" and that if he didn't "deliver" he would be "walked out."

25. Not realizing what was about to happen, Albrecht helpfully responded, "That won't happen." Spadafora snapped back that "as the Director of Sales" he better "deliver or that is what will happen": he would be let go ("When people don't deliver, they get fired."). He said that he was "under the gun" and that Albrecht doesn't "fit the model of the 2020 salesperson," a veiled age reference. He said, "Expectations are high, and my expectation is that you should be doing more cold calling." He then said that they had discussed setting time on Albrecht's calendar to be cold calling. Spadafora then claimed that he had not heard Albrecht on the phone that day, which surprised Albrecht because she knew he had. After a short pause, he blurted out, "So, I'm going to have to let you go." Dumbfounded, Albrecht responded: "I spent yesterday cold calling and just returned from an in-person sales meeting." Spadafora acted like he did not want to hear it. His demeanor throughout was intimidating.

26. The discussion continued but only got worse. Spadafora said that he was "giving [her] until the 31st on the payroll" and then a month's severance. "But," he said, "I'm going to need you to work that first week to train the new BDM coming in." In disbelief, Albrecht asked: "You expect me to work the first week of severance?" He said, "Well, maybe just Monday, Tuesday, and Wednesday … the first three days." She asked him if she was expected to attend the Americas Kickoff meeting, to which he said, "No."

27.     Albrecht was stunned by the sudden termination. Spadafora had no separation or severance documentation and had not consulted Human Resources about the decision or process, contrary to standard practices. Instead, he could only offer how difficult this was on him because he realized "everyone" respected Albrecht. Spadafora then suggested that Albrecht could be untruthful about what was happening: he said that Albrecht could say that she was leaving voluntarily and that he would back her up. He ended the meeting with the expectation that Albrecht would email all prospects letting them know that she was departing HRS and introducing Spadafora as the new contact. When Albrecht said nothing, Spadafora said that a Human Resources manager would be in touch "to hash it out with her on Monday." He then wished her a "great weekend," and Albrecht left to pack up her things and leave the office for the last time after nearly five years.

28.     Albrecht, who prides herself on work ethic and integrity, went home from the termination meeting to finish follow-up items from the earlier prospect meeting. Over the next days, she complied with Spadafora's directive to work the next two weeks, which included training the new BDMs.

29.     Spadafora's explanations for the sudden termination were that Albrecht did not "fit the model of the 2020 salesperson" and that he (supposedly) had not heard Albrecht making any cold calls that day. The first explanation itself reflects HRS's age bias, and the second explanation is false and a pretext for age discrimination.

30. On or about the week after the Spadafora meeting, an HRS Human Resources person sent Albrecht severance paperwork indicating that her last day of employment would be January 31, 2020. The paperwork included a small severance offer and asked her to sign away her rights under the age-discrimination laws.

31. In or about the week of January 20, 2020, Albrecht spoke with Neufang by phone. Neufang, who would soon be "let go" herself, apologized for recruiting Albrecht to HRS. Neufang said that HRS had become a "hostile, toxic work environment" over the past year and suggested that Vince was "probably only following marching orders" when he fired Albrecht. Neufang also complimented Albrecht's "robust pipeline" and how she had achieved it in only six months.

32. On or about March 9, 2020, Albrecht filed a charge of age discrimination against HRS with the United State Equal Employment Opportunity Commission and the Texas Workforce Commission – Civil Rights Division. More than 180 days have elapsed, and the EEOC issued a right-to-sue notice that Albrecht received on or about April 12, 2021. Albrecht requested a right-to-sue letter from the TWC-CRD on or about April 21, 2021. Albrecht has exhausted all administrative prerequisites to filing suit under the ADEA and TCHRA.

33. HRS Group claims that its employees "are the foundation and soul of HRS." And while HRS Group claims among its values "mutual

responsibility" – meaning, that those associated with HRS "appreciate and genuinely care for each other"[1] – HRS's willful mistreatment of a long-time, loyal, and hard-working employee like Albrecht and other older employees shows this to be a hollow claim. For example, although HRS Group claims that "[a]ny employee who discriminates against or harasses another will be subject to disciplinary action…," the company has, on information and belief, taken no action – disciplinary or otherwise – against Ragge, Spadafora, or anyone else involved in the age-biased personnel decisions that impacted Albrecht (and likely others).

34.     The sudden termination, based on false reasons, has had a terrible impact on Albrecht. As a survivor of a recent serious health condition, Albrecht's mindset in the wake of the termination immediately went to "what if I don't have health benefits?" And as a recent widow, Albrecht's livelihood depended on her HRS compensation. She had immediate financial concerns. Beyond those grave concerns, HRS's discrimination caused Albrecht significant harm – both personal and professional, and both economic and non-monetary. The harm HRS inflicted on her is severe and lasting. On a personal level, HRS's illegal conduct caused Albrecht, among other harms, anxiety, stress, sleeplessness, mental anguish and emotional distress, and other non-economic injuries. The loss of HRS health benefits forced her to postpone

---

[1] OUR VALUES, HRS Group website (available at: https://jobs.hrs.com/content/Our-values/?locale=en_US)(last visted Apr. 22, 2021).

needed medical procedures, leading to both undue stress and health complications. On a professional level, HRS damaged Albrecht's reputation, among other harms.

## V.    CAUSES OF ACTION

### COUNTS ONE AND TWO:  AGE DISCRIMINATION UNDER THE ADEA AND THE TEXAS LABOR CODE

35.    Albrecht incorporates by reference paragraphs 1 through 34.

36.    Congress enacted the ADEA after finding that "older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs," that "the setting of arbitrary age limits regardless of potential for job performance [had] become a common practice…," that older workers' employment problems were "grave," and that "the existence in industries affecting commerce, of arbitrary discrimination in employment because of age, burdens commerce …." 29 U.S.C. § 621. Congress intended the ADEA to "promote the employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." *Id.* Consequently, the ADEA make it an unlawful employment practice for employers to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, or privileges of employment, because of such individual's age…." 29 U.S.C. § 623(a).

37. The Texas Legislature enacted the TCHRA, among other reasons, to "secure for persons in this state… freedom from discrimination in certain employment transactions, in order to protect their personal dignity," to "make available to the state the full productive capacities of persons in this state," including those 40 years and older, and to promote "the interests, rights, and privileges of persons in this state." TEX. LAB. CODE § 21.001. Consequently, the TCHRA also forbids discrimination in the terms, conditions, and privileges of employment because of age. TEX. LAB. CODE § 21.051. The TCHRA protects employees who are 40 years of age or older. TEX. LAB. CODE § 21.101.

38. HRS's actions and omissions are unlawful age discrimination under the ADEA and the TCHRA. HRS terminated Albrecht (then-age 55) because of her age. HRS would not terminated Albrecht at the time that it did had she been younger and/or had HRS not acted on impermissible age bias and stereotypes. Moreover, HRS knew that its actions violated the ADEA and the Texas Labor Code and/or acted with reckless disregard for Albrecht's rights.

## DAMAGES AND OTHER REMEDIES

39. Albrecht incorporates by reference paragraphs 1 through 38.

40. HRS's discrimination caused Albrecht significant harm. The ADEA and TCHRA entitle her to be made whole for this harm. She seeks equitable relief necessary to return her to the position that she would have held absent HRS's unlawful conduct and to protect her and others from age discrimination.

41. HRS's discrimination caused Albrecht to suffer – and she expects yet to suffer – pecuniary losses, including but not limited to, lost wages and other benefits associated with employment.

42. As a further result of HRS's unlawful conduct, Albrecht has suffered – and continues to suffer – non-pecuniary losses including, among others, humiliation, damage to professional and personal reputation, undue stress, anxiety, mental distress and anguish, loss of enjoyment of life, and other non-pecuniary losses.

43. HRS acted with malice and/or reckless indifference to Albrecht's rights. The Texas Labor Code authorizes and demands punitive damages in an amount necessary to punish HRS's lawbreaking and deter others from violating this key public policy.

44. HRS acted willfully, in that it acted with reckless disregard for Albrecht's rights under federal and state law. Consequently, HRS is liable for liquidated damages.

45. HRS's unlawful conduct forced Albrecht to retain counsel to address the harms done. Consequently, she seeks attorney's fees, expert costs, costs of suit, and other reasonable litigation expenses.

## CONDITIONS PRECEDENT

46. Albrecht exhausted available administrative remedies under the ADEA and the TCHRA. All conditions precedent to recovery on the claims

asserted above have been performed, satisfied, met, and exhausted or have been waived.

## VI.     JURY DEMAND

47.     Albrecht requests a jury trial on all issues and claims in this case.

## PRAYER FOR RELIEF

WHEREFORE, Albrecht prays that HRS be summoned to appear and answer, and that on final trial or summary disposition, the Court enter a judgment for Albrecht against HRS for the following:

a.  A declaration that HRS's actions violated United States and Texas law;

b.  Equitable relief necessary to permanently and forever prevent HRS from discriminating against Albrecht and other employees because of age;

c.  Reinstatement to the position and seniority that she would have held but for discrimination, and all other equitable relief necessary to restore Albrecht to the position that she would have held but for discrimination; and front pay if this other equitable relief is not feasible;

d.  Back pay, including but not limited to lost wages and other employment benefits;

e.  Actual and compensatory damages;

f.  Liquidated damages in the maximum amount allowed by law;

g.  Punitive damages in an amount determined by the jury that is sufficient to punish HRS for its lawbreaking and deter this defendant and other employers from engaging in similar lawbreaking;

h.  Pre- and post-judgment interest;

i.  Attorney's fees, expert fees, costs of suit, and other reasonable litigation expenses; and

j.     All other legal and equitable relief to which Albrecht is justly entitled.

Dated: May  18 , 2021

Respectfully submitted,

GILLESPIE SANFORD LLP

4803 Gaston Ave.
Dallas, Texas 75246
Tel:    214.800.5111
Fax:   214.838.0001

By: /s/ *James D. Sanford*
   James D. Sanford
   Texas Bar No. 24051289
   Email: jim@gillespiesanford.com

ATTORNEYS FOR PLAINTIFF
SANDRA L. ALBRECHT